UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

Sharon M. Knope,

Plaintiff,

v.

William P. Barr, *in his official capacity as*
*Attorney General of the United States,*

Defendant.

**Report and Recommendation**

16-CV-809V

## I.  INTRODUCTION

Plaintiff Sharon Knope worked for about 20 years as a Victim Witness Coordinator in the United States Attorney's Office for the Western District of New York ("USAO").  Plaintiff received positive evaluations for her work, even after she was diagnosed in 2005 with celiac disease, irritable bowel syndrome, and frequent kidney stones.  For about the last four years of her employment, however, plaintiff's worsening medical conditions, the USAO's formal and informal expectations for her job, and some possible personality conflicts came into tension with each other.  The flashpoint was after-hours availability.  Simply put, plaintiff and the USAO never had a meeting of the minds as to how essential after-hours availability was to plaintiff's job.  Some miscommunications resulted, though the miscommunications never led to any disciplinary action.  By the time the two sides began communicating to reach a meeting of the minds, plaintiff's health deteriorated to the point at which she took indefinite leave, applied for disability retirement, and never worked again.

This litigation began because plaintiff believes that the issue of after-hours availability led to more than ordinary office disputes and tensions—it led to a failure to accommodate her medical conditions and to efforts to target her as a woman and as an older employee.  After completing the prerequisite administrative proceedings, plaintiff sued defendant—nominally the Attorney General,

but effectively the USAO—for violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–12213; Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e to 2000e-17; and the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621–634. (Dkt. No. 28 (docket numbers hereafter in brackets).) Following discovery, defendant filed a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. [45.] The USAO raises the procedural point that the ADA does not cover federal employees. On substance, most of the USAO's arguments flow from the issue of after-hours availability and the critical contention that after-hours availability was an essential function of plaintiff's job. If so then the USAO could not grant plaintiff's request to eliminate after-hours availability entirely as a reasonable accommodation. Any events that occurred in connection with after-hours availability would not have been discriminatory in nature. At most, many disagreements between the two sides would have been ordinary office conflicts. Plaintiff opposes the pending motion, viewing the issue of after-hours availability—particularly any suggestion of 24-hour availability—as a drastic and non-essential change in her employment that exacerbated her medical conditions. Plaintiff views the issue along with other office conflicts as part of a larger campaign to drive her out of the office because she was an older woman with a higher salary.

District Judge Lawrence J. Vilardo has referred this case to this Court under 28 U.S.C. § 636(b). [7.] The Court has deemed the motions submitted on papers under Rule 78(b). For the reasons below, the Court respectfully recommends granting defendant's motion.

## II.    BACKGROUND

This case concerns allegations that the USAO pushed plaintiff out of her job by changing the terms of her employment and then refusing to make any accommodation for her medical conditions. Plaintiff began working for the USAO in 1996. From 1996 until her termination in

2

2016, plaintiff worked as the Victim Witness Coordinator in the USAO's Buffalo office.[1]  The

parties dispute exactly what plaintiff's job entailed, but the following description from plaintiff's

second amended complaint is an undisputed summary of the job's core responsibilities:

> In this position Ms. Knope managed the district's victim witness program; in
> that she handled all the victim cases for the Buffalo Office, notified victims of case
> status and their rights as victims, accompanied victims to court proceedings and
> explained the criminal justice process, and provided referrals to victim assistance
> agencies as needed, handled witness management for trials, including witness travel
> arrangements for out of town witnesses, assisting any other local witnesses that may
> need assistance in getting to court, answering their questions about the court process.

[28 at 4–5.]  Around 2005, plaintiff was diagnosed with celiac disease, irritable bowel syndrome, and

frequent kidney stones.  Nonetheless, plaintiff's employment between 1996 and 2012 appears to

have been largely uneventful.

The events that led to plaintiff's litigation began in 2012.  Around May 2012, plaintiff learned

that her office would be moving within the USAO.  [45-6 at 35.]  The USAO occupies three floors

of the building in which it resides—the fourth, fifth, and sixth floors.  Plaintiff had been located on

the fourth floor with the USAO's administrative staff.  Plaintiff now was moving to the fifth floor

with the criminal trial attorneys.  The USAO justified the move based on plaintiff's extensive work

in criminal cases, but plaintiff considered the move a demotion:

Q. What did you believe the intent was?

A. To—to demote me.

Q. Why would a move to the fifth floor be considered a demotion?

A. Because the fifth floor was mostly just drug/narcotics attorneys, and I didn't
    really—you know, they have a rare victim case, but my primary caseload
    came from the criminal attorneys on the sixth floor.  And because the U.S.
    Attorney and the first assistant criminal chief were always on the sixth floor,

[1] Early in plaintiff's career with the USAO, she also handled duties related to grand jury logistics.  [*See* 45-6 at
4.]  This additional duty does not affect the Court's analysis below but is noted for the sake of the record.

3

> the perception is always, you know, that's where the—the higher folks are.

> Q. On the sixth floor?

> A. Yeah. I mean, not—I mean, it wasn't like it was a real, you know, big deal, but it was definitely seen in the office as a punishment, demotion, because when I was—when I was moving into my fifth floor office, everybody on the fifth floor and people that were coming down from the sixth floor, every single person said to me, who did you piss off, why are you being punished.

[45-6 at 39.] The move created a related issue about whether plaintiff had a nameplate outside her office that would allow attorneys to find her easily. Around the same time, plaintiff had a meeting with then-United States Attorney William Hochul. Plaintiff recalled the meeting as a confrontational one that increased her stress and exacerbated her medical conditions:

> He [Hochul] then went on to say [that] I "need to do more," I "need to be more involved," [and] I'm "not doing enough" and when I tried to ask what he meant he wouldn't answer, kept cutting me off. He said, "Sharon, you're one of the highest paid people in this office." My "salary and position are preventing him from hiring more attorneys." He "doesn't know how I got to be a GS-13 [salary level]." His tone of voice was *scathing* as he said all this. He reiterated that I don't do enough, that he wants me to do more, but still wouldn't say what or give me any direction. He wouldn't answer my questions and then just dismissed me from his office.

[45-17 at 3.] The second amended complaint describes an incident in 2014 in which an apparent miscommunication about providing trial support led to an angry verbal confrontation by one of the trial attorneys. [28 at 7–8.] The confrontation exacerbated plaintiff's stress. By 2015, plaintiff's supervisors developed an understanding that plaintiff had to be available after hours to address victim witness issues that could not wait until the next business day. The understanding was that availability after hours meant availability "24/7." [55-7 at 2.][2] This understanding differed in degree, though not in kind, from plaintiff's experience up to that point. Plaintiff testified at her deposition that phone calls after hours were "pretty rare" prior to 2012. [45-6 at 51.] Plaintiff did

---

[2] Plaintiff cites the email chain in this portion of the record to claim that the expectation of 24-hour availability began in 2013. [55 at 9.] The email messages themselves, though, appear to contain dates in 2015.

acknowledge, though, the significance of having an office-issued cellular phone:

> Q. And, again, what's your understanding as to why you were issued a government—
> an office-issued cell phone?
>
> A. It was to take the—replace the pager. We weren't using pagers anymore, so we
> were just—they had—technology had upgraded to a cell phone, so we were
> given a cell phone and that's all. And at the time I assumed that the
> instructions for that were the same as they had been with the pager, that I
> would just be responsible for any emergencies that may come up.
>
> Q. So was it your understanding that in your position from time to time issues with
> either victims or witnesses may arise outside of normal business hours and
> someone may need to reach you?
>
> A. For an emergency, yes, and it was primarily for—usually for trial situations.
>
> Q. Okay. So a trial's going on and a witness might need a last-minute reservation,
> travel arrangements, or any other number of things that might come up while
> a trial is happening?
>
> A. Yes.

[*Id.* At 49.]

To the extent that the parties had different understandings of plaintiff's availability after hours, those differences came to the forefront during an incident in June 2015. In short, the USAO's Rochester office had a child pornography case that named a man and a woman as defendants. A Rochester area radio station posted a photograph of the woman defendant on its website. A school district in the Rochester area became concerned that the photograph could allow viewers to realize that the woman defendant had children in that school district and could allow viewers to identify who those children were. [45-15 at 5.] The USAO deliberated about whether and how to approach the radio station about removing the photograph from its website. The deliberations included contacting plaintiff to draw on her experience handling victim witnesses

including witnesses in child pornography cases.[3]  Due to medical illness, however, plaintiff did not

respond to any phone calls or email messages over an entire weekend when the deliberations

occurred.  Members of the USAO were upset the following Monday morning and requested an

explanation when plaintiff finally checked in with them.  Plaintiff explained that she had been sick all

weekend and was unable to check her phone for calls or messages.  [45-29 at 2.]  Some discussion

ensued about plaintiff's responsibility to respond after hours, but the USAO attempted no

disciplinary action.  The only action that the USAO took was a comment in plaintiff's 2015 mid-year

review that "an issue" about availability had arisen that was being investigated.  [45-27 at 9.]  The

review otherwise contained positive comments that plaintiff earned praise for her work on several

occasions.  [*Id.*]

The final events pertaining to the case and to the pending motion began after the June 2015

weekend incident.  A few days later, on June 18, 2015, plaintiff obtained a medical note stating that

she "should not be on call until further notice."  [45-32 at 3.][4]  A few days after obtaining the

medical note, on June 24, 2015, plaintiff submitted a DOJ Form 100A Request for Reasonable

Accommodation.  [45-32 at 2.]  Plaintiff requested the accommodation of being removed from all

on-call responsibilities.  Plaintiff cited her medical note and "the worsening of my disability—celiac

disease" and offered that "my primary physician will provide more information if necessary."  [*Id.*]

Plaintiff's request appears to have prompted a continuing conversation by email between her, her

supervisors at the USAO, and the General Counsel's Office at the Department of Justice in

Washington, DC.  [45-42 at 2–4.]  The conversation centered around whether and to what extent

---

[3] The record is not clear as to why the USAO needed to reach plaintiff when the case originated in the Rochester office, and the Rochester office has its own Victim Witness Coordinator.  [*See* 45-31 at 2.]
[4] The medical note appears to have the mistaken date of June 18, 2017.  The year 2015 likely was intended.

after-hours availability constituted an essential function of plaintiff's job. The email thread ended with an agreement that the General Counsel's Office would continue the conversation with plaintiff's attorney. Meanwhile, on August 14, 2015, plaintiff obtained another medical note stating that she was not "allowed to be on call 24/7 for work without exception. A copy of this letter is being added to the patient's medical chart. If you are in need of further information, it is advised that you obtain proper release of information from Sharon and contact me directly regarding what accommodations may be made for her since I am medically advising against call 24/7 for work." [45-42 at 5.] On August 28 and September 11, 2015, the General Counsel's Office did in fact resume the conversation with plaintiff's attorney, asking whether plaintiff would consent to having her doctors contacted. [45-43 at 2.] While these communications were pending, two more incidents occurred regarding victim witnesses and communications with them. [45-44; 45-45.] Beyond some discussion, the USAO took no formal action. When plaintiff's counsel responded to the General Counsel's Office on September 14, 2015, permission to speak to plaintiff's physicians was denied despite the invitations in plaintiff's request for accommodation and in her physician's note. [45-46 at 2.] Counsel then reiterated the position that after-hours availability was not an essential function of the Victim Witness Coordinator job; and that plaintiff could be accommodated either by removing the need for availability or by moving her to another open position. [*See generally* 45-46.] A few days later, on September 18, 2015, plaintiff provided medical documentation that she could not perform any functions of her job at all. [45-51 at 2.] On September 21, 2015, plaintiff went on indefinite leave under the Family and Medical Leave Act. On December 22, 2015, plaintiff's medical treatment providers furnished a letter explaining that plaintiff was "unable to work at any job for at least 12 months starting 12/7/2015 due to the nature of stress it causes on her body, mind [sic] and the myriad of exacerbations she is experiencing related to these known medical conditions." [45-53

7

at 4.]  As far as the Court can tell from the record, plaintiff did not appear at the USAO again after September 18, 2015.  [45-61 at 2.]  With plaintiff now on record from her own medical providers that she could not work any job for an indefinite time, the USAO served plaintiff on February 12, 2016 with a proposed removal from her position.  [45-56.]  The proposed removal cited medical inability to perform duties and excessive absence.  [*Id.* at 7.]  Through counsel, plaintiff responded to the proposed removal on March 11, 2016.  [45-57.]  Among other issues, the response continued to press for a reasonable accommodation without directly addressing the remark from plaintiff's own medical providers that she was "unable to work at any job for at least 12 months."  In fact, the response contained the following paragraph, which reads almost as if it blamed the USAO for plaintiff's deteriorating health by not finding a reasonable accommodation earlier:

> In fact, by the Agency's own admission in the proposed removal letter, Ms. Knope has been threatened, since at least December 11, 2015, with termination.  The contention that the Agency cannot accommodate nor re-assign Ms. Knope now is senseless.  Had the Agency acted promptly and in good faith when Ms. Knope's reasonable accommodation request was submitted on June 24, 2015, before her medical condition worsened and required medical leave, the issue would have been resolved.

[45-57 at 13.]  On April 4, 2016, the USAO formally terminated plaintiff.  [45-58.]

Plaintiff's legal efforts began with the filing of an Equal Employment Opportunity ("EEO") complaint with the Department of Justice on August 10, 2015.  [45-33.]  In the complaint, plaintiff summarized events from the preceding two years that she believed constituted harassment and an intentional effort to eliminate her from the office.  Plaintiff filed a second EEO complaint on April 2, 2016 [45-59]; she did so because she believed that the USAO's decision to proceed with the proposed removal constituted retaliation for filing the first complaint.  On September 9, 2016, the Department of Justice found no discriminatory acts and dismissed plaintiff's complaints.  Plaintiff then filed her original complaint on October 11, 2016 and her second amended complaint, the

current operative pleading, on September 26, 2017.  The second amended complaint [28] contains a total of seven claims: discrimination, hostile work environment, and retaliation in violation of the ADA; discrimination, hostile work environment, and retaliation in violation of Title VII; and discrimination in violation of the ADEA.

The USAO filed the pending motion on May 31, 2019.  As a preliminary matter, the USAO seeks summary judgment on all of the ADA claims because the ADA does not cover federal employees.  "The Rehabilitation Act is the sole and exclusive remedy for federal employees asserting claims of employment discrimination."  [45-2 at 23.]  As for substantive issues, the USAO argues that after-hours availability was an essential function of plaintiff's job and that her "inability to perform that function is fatal to her claim."  [*Id.* at 25.]  The USAO argues that it was not required to hire additional employees or to change plaintiff's responsibilities in response to her inability to perform an essential function.  The USAO argues further that it never reached a point at which it actually denied plaintiff's request for a reasonable accommodation.  According to the USAO, plaintiff made the request; the USAO requested additional information; and plaintiff declined to provide that information while withdrawing from the interactive process and beginning what became indefinite leave.  With respect to plaintiff's other allegations, the USAO argues that it had legitimate, non-discriminatory reasons to terminate plaintiff.  Plaintiff was unable to perform her job, according to the USAO, and was absent from her job long enough to create a hardship on others in the office.  Plaintiff's allegations of a hostile work environment, even if accepted as true, do not meet the necessary legal thresholds because the alleged conduct never altered the conditions of her employment.

Plaintiff opposes the USAO's motion in all respects.  Plaintiff argues that similarly situated male employees were permitted to do a substantial amount of their work from home when they had

disabilities.  Similarly situated male employees, according to plaintiff, also did not face questions about their salary and were not subjected to verbal abuse or two false disciplinary issues.  With respect to the essential functions of her job, plaintiff argues that essential functions are questions for jury, assuming that "there can ever be any reasonable accommodation when the demand is absolute 100% immediate availability."  [55 at 30.]  Plaintiff argues that the USAO has not shown that her requested accommodation would have caused an undue burden.  Plaintiff implicitly concedes the USAO's argument that the ADA does not cover federal employees.  Nonetheless, "Ms. Knope asserts that, because the facts plead in her Complaint and revealed through discovery establish the elements of a disability claim under the ADA, they similarly establish the elements of a disability claim under the Rehabilitation Act.  Accordingly, the Complaint should be read as having plead claims under the Rehabilitation Act or Ms. Knope should be permitted to amend her complaint to conform the causes of action to the facts already resolved through discovery."  [*Id.* at 32.]  Plaintiff believes that she has established age-related discrimination through the USAO's complaints about her salary.  Finally, plaintiff argues that the USAO retaliated against her when it initiated removal proceedings while her first EEO complaint was pending.

III.  **DISCUSSION**

### A.  *Summary Judgment Generally*

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "As to materiality, the substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment . . . . More important for present purposes, summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such

that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). "The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists. In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant . . . . Summary judgment is improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted). "Where, as here, the nonmovant would bear the burden of proof at trial, the movant may show prima facie entitlement to summary judgment by either (1) pointing to evidence that negates its opponent's claims or (2) identifying those portions of its opponent's evidence that demonstrate the absence of a genuine issue of material fact." *Barlow v. Male Geneva Police Officer who Arrested me on Jan. 2005*, 434 F. App'x 22, 25 (2d Cir. 2011) (summary order) (internal quotation and editorial marks and citation omitted).

### B. Constructive Amendment of Plaintiff's ADA Claims

Before addressing the core of the pending motion, the Court needs to address a preliminary matter concerning the form of the second amended complaint. Specifically, the Court needs to decide what to do about the USAO's argument that the ADA does not apply to federal employees. Plaintiff does not contest the point directly. Plaintiff cannot contest the point because the USAO is correct. *See* 42 U.S.C. § 12111(5)(B)(i) ("The term 'employer' does not include the United States . . . ."); *Johnson v. Dep't of Interior*, 189 F.3d 461, 1999 WL 710123, at *1 (2d Cir. Sep. 2, 1999) (table case) ("As an initial matter, appellant's ADA claim was properly dismissed because the ADA expressly excludes the federal government from coverage.") (citing Section 12111(5)(B)(i)). Federal employees, however, have essentially identical protections by way of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. §§ 701–796*l*. *See Rivera v. Heyman*, 157 F.3d 101, 103–04 (2d Cir.

1998) (citations omitted). Plaintiff has asked to have the first three claims in the second amended complaint regarded as claims under the Rehabilitation Act. The USAO's argument thus reduces to whether summary judgment on an unusual technical basis best serves the interests of justice.

This legal error should not have occurred in the first place and should have been caught earlier. If plaintiff were asking to place her claims under a substantively different statute then the Court would be more inclined to deny the request. Switching to a substantively different statute would have implications for discovery, and discovery for this case is closed. Plaintiff, though, is not seeking to switch to a substantively different statute. In this unusual instance, plaintiff has available to her a statute that offers essentially identical remedies without the need to change discovery or any theories of the case. In that context, and considering the analysis that follows below, the Court will make the constructive change for plaintiff. *See In re Zweibon*, 565 F.2d 742, 747 (D.C. Cir. 1977); *In re Bennett Funding Grp., Inc.*, 220 B.R. 743, 752 (Bankr. N.D.N.Y. 1997); *Index Fund, Inc. v. Hagopian*, 609 F. Supp. 499, 503 (S.D.N.Y. 1985) ("Despite the defendants' argument that the plaintiff should not be permitted to amend the complaint in the case at bar, the defendants have made no showing that they would be unduly prejudiced by the proposed amendment."). The Court will proceed construing the first three claims in the second amended complaint as claims under 29 U.S.C. § 794(a).

### C. Plaintiff's Rehabilitation Act Claims (Counts 1–3)

Under the Rehabilitation Act, "No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service." 29 U.S.C. § 794(a). The

Rehabilitation Act assesses non-affirmative action employment discrimination under the same standards as Title I of the ADA. 29 U.S.C. § 791(f). "To establish a *prima facie* case of discrimination based on an employer's failure to accommodate a disability, under either the ADA or the Rehabilitation Act, a plaintiff must demonstrate that (1) the plaintiff is a person with a disability under the meaning of the statute in question; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations. In addition, a plaintiff must show the *connections* between (1) the failure to accommodate a disability, (2) the performance deficiencies, and (3) the adverse employment action." *Natofsky v. City of New York*, 921 F.3d 337, 352 (2d Cir. 2019) (internal quotation and editorial marks and citations omitted). "The elements of a retaliation claim under either the Rehabilitation Act or the ADA are (i) a plaintiff was engaged in protected activity; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action. A causal connection in retaliation claims can be shown either (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Id.* at 353 (internal quotation and editorial marks and citations omitted).

The Second Circuit has not yet decided whether plaintiffs can bring claims of a hostile work environment under the Rehabilitation Act or the ADA. *See Wesley-Dickson v. Warwick Valley Cent. Sch. Dist.*, 586 F. App'x 739, 745 n.2 (2d Cir. 2014) (summary order). Assuming that such claims are possible, "[a] hostile work environment claim requires a plaintiff to prove two principal elements.

First, she must show that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. The complained-of conduct must be objectively hostile or abusive; the plaintiff must subjectively perceive the conduct as hostile or abusive; and the conduct must create the environment because of the plaintiff's disability. If a plaintiff relies on multiple events, the incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive. Courts examine the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. Second, a plaintiff must show that a specific basis exists for imputing the conduct that created the hostile environment to the employer. When harassment is perpetrated by the plaintiff's coworkers, an employer will be liable if the plaintiff demonstrates that the employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it. Where a low-level supervisor does not rely on his supervisory authority to carry out the harassment, the situation will generally be indistinguishable from cases in which the harassment is perpetrated by the plaintiff's co-workers." *Kelly v. New York State Office of Mental Health*, 200 F. Supp. 3d 378, 399 (E.D.N.Y. 2016) (internal quotation and editorial marks and citations omitted).

Here, plaintiff's medical treatment providers undermined her Rehabilitation Act claims when they declared her unable to work at all for an indefinite period of time. In April 2013, the USAO approved plaintiff's request for a part-time schedule for several months. [45-22 at 2.] On September 30, 2013, the USAO denied an initial request for removal from on-call status only because of inadequate medical documentation. [45-24, 45-25.] Plaintiff renewed the request on June 24, 2015. [45-32 at 2.] On August 14, 2015, plaintiff's physician assistant supported plaintiff's

request with a medical note that "Sharon Knope is NOT allowed to be on call 24/7 for work without exception." [45-42 at 5.] As of September 14, 2015, plaintiff's counsel was expressing gratitude to the General Counsel's Office for its willingness "to explore a reasonable accommodation for her work situation." [45-46 at 2.] While the request was under consideration, though, plaintiff's situation changed quickly. Plaintiff never worked again at the USAO after September 18, 2015; she began what became indefinite leave on September 21, 2015. [45-61 at 2.] Around the same time, plaintiff provided the General Counsel's Office with documentation "that she was no longer able to perform *any* functions of her job." [45-51 at 2.] Plaintiff subsequently applied for disability retirement. [*Id.*] A few days later, plaintiff's physician assistant furnished a letter explaining plaintiff's medical conditions and how "[t]hese conditions are NOT expected to improve and the date of possible partial recovery is 12 months from 12/7/2015." [45-53 at 3.] Plaintiff's physician assistant concluded that "[i]t is obvious to this provider that Sharon Knope is unable to work *any job* for *at least* 12 months starting 12/7/2015 due to the nature of stress it causes on her body, mind [sic] and the myriad of exacerbations she is experiencing related to these known medical conditions." [*Id.* at 4 (emphasis added).] Plaintiff's treatment providers have created a situation different than situations in which plaintiffs invoked the legal term "totally disabled" and then had to explain why they did so. *See, e.g., Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 807 (1999) ("When faced with a plaintiff's previous sworn statement asserting 'total disability' or the like, the court should require an explanation of any apparent inconsistency with the necessary elements of an ADA claim. To defeat summary judgment, that explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement, the plaintiff could nonetheless 'perform the essential functions' of her job, with or without 'reasonable accommodation.'"); *Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 119

(2d Cir. 2004) (summary judgment denied where "Dr. Rodal states that if his May 1999 request for a scheduling accommodation had been granted, he could have continued to work as a Group anesthesiologist, performing the essential duties of that job. But, as he stated in the New York action, with no such accommodation having been granted by July 1999, he could no longer carry out the duties of that position and, thus, found it necessary to take disability leave."). Plaintiff's treatment providers have not suggested that plaintiff had to take indefinite leave and had to apply for disability retirement solely because of the issue of after-hours availability. Instead, plaintiff's treatment providers diagnosed plaintiff with medical illnesses that soon worsened to the point at which she could not work any job under any conditions. *Cf. Vazquez v. Southside United Hous. Dev. Fund Corp.*, No. 06-CV-5997(NGG)(LB), 2009 WL 2596490, at *11 (E.D.N.Y. Aug. 21, 2009) ("The ADA does not require an employer to maintain an employee's position while an employee unilaterally takes an indefinite leave of absence."). The final letter from plaintiff's physician assistant does not suggest in any way that removing after-hours availability from plaintiff's job would improve plaintiff's situation at all, let alone within 12 months or any other definite time. *Cf. Potter v. Xerox Corp.*, 1 F. App'x 34, 36 (2d Cir. 2001) (summary order) ("If Potter is totally disabled, then he cannot perform the essential functions of his job or any job."); *Clark v. New York State Elec. & Gas Corp.*, 67 F. Supp. 2d 63, 75 (N.D.N.Y. 1999) ("Plaintiff claims that she is permanently disabled and unable to return to work, even with accommodations. Because Plaintiff is totally disabled, and cannot perform her job with or without reasonable accommodation, she is not a 'qualified individual with a disability' within the meaning of the ADA and, therefore, cannot succeed on her claim for discrimination based on the ADA.") (citations omitted).

The apparently rapid deterioration of plaintiff's health is sad and worthy of sympathy, but that same deterioration was independent of the ongoing discussion about reasonable

accommodations and made the issue of reasonable accommodations irrelevant. Consequently, no matter how a jury might have deliberated over other essential functions of the Victim Witness Coordinator job, no reasonable jury could disagree that attendance was an essential function. No reasonable jury thus could conclude that plaintiff is a qualified individual with a disability. At the same time, plaintiff has not shown any material alteration in her conditions of employment while she was still working. Because plaintiff's indefinite absence forced the USAO to do something about filling plaintiff's role, the removal proceedings did not amount to retaliation. Under these circumstances, summary judgment is appropriate for the first three claims in plaintiff's second amended complaint.

### D. Plaintiff's Title VII Claims (Counts 4–6)

The Court turns next to plaintiff's three claims under Title VII. "Title VII applies to federal government employment by way of 42 U.S.C. § 2000e-16. The Rehabilitation Act makes Title VII's rights and remedies available to federal employees by way of 29 U.S.C. § 794a." *DeMuth v. McMahon*, No. 16-CV-125A, 2019 WL 806898, at *5 (W.D.N.Y. Feb. 21, 2019), *report and recommendation adopted*, No. 16-CV-125A, 2019 WL 1979704 (W.D.N.Y. May 3, 2019).

With respect to the discrimination claim, "plaintiff must establish a *prima facie* case of sex discrimination by demonstrating that (1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination. The burden of establishing a prima facie case is not onerous, and has been frequently described as minimal. If the plaintiff successfully establishes a prima facie case, the burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action. If the employer carries that burden, the plaintiff's admissible evidence must show circumstances that

would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Walsh v. New York City Hous. Auth.*, 828 F.3d 70, 75 (2d Cir. 2016) (internal quotation marks and citations omitted).

"Proving the existence of a hostile work environment involves showing both objective and subjective elements: the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive. Among the factors we consider are the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the employee's work performance. As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive. However, a single act can create a hostile work environment if it in fact works a transformation of the plaintiff's workplace." *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004) (internal quotation and editorial marks and citations omitted).

Finally, "[i]n order to establish a *prima facie* case of retaliation, an employee must show [1] participation in a protected activity known to the defendant; [2] an employment action disadvantaging the plaintiff; and [3] a causal connection between the protected activity and the adverse employment action." *Id.* at 156 (internal quotation marks and citations omitted).

Here, the record lacks enough information to allow plaintiff to make a *prima facie* case. Plaintiff never experienced an adverse employment action. The closest that the record comes to documenting an adverse employment action is in the 2015 mid-year progress review. [45-27 at 9.] In that review, the USAO gave plaintiff generally positive remarks and stated only that "an issue arose with after-hours communication which is being addressed." [*Id.*] On other occasions, when disputes arose about victim witness management, the USAO declined to pursue any kind of

reprimand. [45-7 at 32; 45-19 at 14.] *Cf. Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 255 (E.D.N.Y. 2012) ("Since neither the more frequent observations nor the negative reviews of the plaintiff's work had any material consequences on the terms and conditions of Sotomayor's employment, they are not adverse employment actions."). For purposes of the pending motion, the Court will give plaintiff the benefit of the doubt that her June 2012 meeting with Hochul was confrontational and maybe even verbally abusive in a general sense. Plaintiff herself, though, testified that Hochul made no comments about her as a woman. [45-6 at 28.] In the broader office environment, plaintiff perceived that Hochul did not like to hire female attorneys but could not support that perception with any first-hand knowledge. [45-6 at 29.] Other confrontations described in the second amended complaint would fall into the same analysis: at most unprofessional but not targeting plaintiff as a woman and not altering her terms of employment. *Cf. Martinez v. New York City Dep't of Educ.*, No. 04 CIV. 2728 LTS DFE, 2008 WL 2220638, at *8 (S.D.N.Y. May 27, 2008) ("While the record certainly contains evidence suggesting that Sulner disliked Plaintiff personally, there is nothing in the record from which it can be inferred that such dislike was due to his sex and, if anything, Plaintiff's own testimony regarding two female employees who allegedly lived in constant fear of Sulner because they perceived that Sulner did not like them undermines Plaintiff's claim that Sulner was biased against men."). Under these circumstances, summary judgment is appropriate for the fourth, fifth, and sixth claims in the second amended complaint.

### E. Plaintiff's ADEA Claim (Count 7)

Finally, the Court will address briefly plaintiff's claim of discrimination under the ADEA. "In order to establish a prima facie case of age discrimination, [plaintiff] must show (1) that she was within the protected age group, (2) that she was qualified for the position, (3) that she experienced

adverse employment action, and (4) that such action occurred under circumstances giving rise to an inference of discrimination." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 107 (2d Cir. 2010) (citation omitted). The first factor is not in dispute here; the second factor is not in dispute either, at least up to the beginning of plaintiff's indefinite absence. The problem for plaintiff is the third factor. As with her Title VII claims, plaintiff has not shown that she ever suffered an adverse employment action. Plaintiff's title, salary, and benefits never changed. Other than the issue of after-hours availability, plaintiff's responsibilities never changed. *Cf. Mabry v. Neighborhood Def. Serv.*, 769 F. Supp. 2d 381, 399 (S.D.N.Y. 2011) ("Plaintiff's allegation that he was excluded from management meetings, when considered in context, does not constitute an adverse employment action. As plaintiff alleged in his Complaint, he continues to maintain his position as the Computer Services Director of NDS, he has not been put on a performance improvement plan and his role and responsibilities have remained largely the same, with the exception that he is now supervised by the COO, who also supervises the human resources department and facilities, rather than the Executive Director."); *Kearney v. Cty. of Rockland*, 373 F. Supp. 2d 434, 443 (S.D.N.Y. 2005) ("Plaintiff has failed to proffer any evidence demonstrating that her reassignment to the Criminal Unit resulted in a change in her job responsibilities 'so significant as to constitute a setback' to her career, or that her chances for promotion were in any way affected by the transfer."). With respect to after-hours availability, plaintiff herself has acknowledged that some amount of availability always was part of her job. [*See* 45-6 at 47, 49.] Even if the Court gave plaintiff the benefit of the doubt that the terms of after-hours availability changed at some point, nothing in the record suggests that the changes occurred to target older workers. Plaintiff testified that the increase in after-hours calls that she experienced was attributable to the increase in the number of trials that the USAO had. [45-6 at 52.] Most of the calls concerned last-minute changes in arrangements for victim witness travel. [*Id.*] In

fact, the record indicates that any changes or clarifications about after-hours availability occurred in consultation with the General Counsel's Office [45-36 at 2]; plaintiff has not accused that office of discriminating against her as well. Other issues failed to add support to plaintiff's claim. Plaintiff has testified that Hochul said nothing about her age during the June 2012 meeting. [45-6 at 31.] Hochul allegedly made comments to the effect that plaintiff's salary was out of proportion to the substance of her job; plaintiff chose to interpret those comments as an indirect criticism of her age. Plaintiff similarly chose to make negative inferences about the relocation of her office. [45-6 at 39.] There might well be an internal office culture at the USAO that informally views certain office locations as more prestigious than others. Informal office perceptions, however, do not by themselves rise to the level of an adverse employment action. *Cf. Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004) ("[S]ubjective, personal disappointments do not meet the objective indicia of an adverse employment action.") (citation omitted). The Court also keeps in mind that, as with plaintiff's claims under the Rehabilitation Act, any discussion of what plaintiff's job was or was not supposed to be became irrelevant once her own treatment providers declared her unable to work any job under any circumstances, indefinitely. For these reasons, summary judgment is appropriate for the seventh claim in the second amended complaint.

## IV.    CONCLUSION

For all of the foregoing reasons, the Court respectfully recommends granting defendant's motion (Dkt. No. 45).

## V.    OBJECTIONS

A copy of this Report and Recommendation will be sent to counsel for the parties by electronic filing on the date below. "Within 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed

21

findings and recommendations." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Any objections must be filed electronically with the Clerk of the Court through the CM/ECF system.

"As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point." *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted); *see also Mario v. P & C Food Markets, Inc.*, 313 F.3d 758, 766 (2d Cir. 2002) ("Where parties receive clear notice of the consequences, failure timely to object to a magistrate's report and recommendation operates as a waiver of further judicial review of the magistrate's decision.") (citation omitted). "We have adopted the rule that failure to object timely to a magistrate judge's report may operate as a waiver of any further judicial review of the decision, as long as the parties receive clear notice of the consequences of their failure to object. The rule is enforced under our supervisory powers and is a nonjurisdictional waiver provision whose violation we may excuse in the interest of justice." *United States v. Male Juvenile (95-CR-1074)*, 121 F.3d 34, 38–39 (2d Cir. 1997) (internal quotation marks and citations omitted).

"Where a party only raises general objections, a district court need only satisfy itself there is no clear error on the face of the record. Indeed, objections that are merely perfunctory responses argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original papers will not suffice to invoke de novo review. Such objections would reduce the magistrate's work to something akin to a meaningless dress rehearsal." *Owusu v. N.Y. State Ins.*, 655 F. Supp. 2d 308, 312–13 (S.D.N.Y. 2009) (internal quotation and editorial marks and citations omitted).

SO ORDERED.

___/s Hugh B. Scott_____
Hon. Hugh B. Scott
United States Magistrate Judge

DATED: October 8, 2019